624 F.2d 461
 1980-1 Trade Cases 63,097, 1980-2 Trade Cases 63,408,
5 Fed. R. Evid. Serv. 628,
6 Fed. R. Evid. Serv. 371
 UNITED STATES of America, Appellee,
v.
SOCIETY OF INDEPENDENT GASOLINE MARKETERS OF AMERICA, Appellant.
UNITED STATES of America, Appellee,
v.
AMERADA HESS CORPORATION, Appellant.
UNITED STATES of America, Appellee,
v.
ASHLAND OIL, INC., Appellant.
UNITED STATES of America, Appellee,
v.
KAYO OIL COMPANY, Appellant.
UNITED STATES of America, Appellee,
v.
The MEADVILLE CORPORATION, Appellant.
UNITED STATES of America, Appellee,
v.
PETROLEUM MARKETING CORPORATION, Appellant.
UNITED STATES of America, Appellee,
v.
Robert R. CAVIN, Appellant.
 Nos. 77-2515 to 77-2521.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1979.
Decided December 26, 1979.
Upon Rehearing June 24, 1980.
 
 Wilbur D. Preston, Jr., Baltimore, Md. (Nevett Steele, Jr., Gerson B. Mehlman, Whiteford, Taylor, Preston, Primble & Johnston, Baltimore, Md., A. T. Biggers, Continental Oil Company, Houston, Tex., on brief), for appellant Kayo Oil Company.
 John H. Lewin, Jr., Baltimore, Md. (Benson E. Legg, Venable, Baetzer & Howard, Baltimore, Md., Adlai S. Hardin, Jr., Milbank, Tween, Hadley & McCloy, New York City, Howard B. Myers, Amerada Hess Corporation, Woodbridge, N. J., on brief), for appellant Amerada Hess Corporation.
 William Simon, Washington, D. C. (Ray S. Bolze, Roger C. Simmons, Howrey & Simon, Washington, D. C., Robert H. Compton, Ashland Petroleum Company, Ashland, Ky., on brief), for appellant Ashland Oil, Inc.
 Robert E. Nagle, Donald T. Bucklin, Washington, D. C. (Wald, Harkrader & Ross, Washington, D. C., on brief), for appellant Robert R. Cavin.
 David F. Albright, Baltimore, Md. (Richard M. Kremen, Franklin T. Caudill, Seemes, Bowen & Semmes, Baltimore, Md., on brief), for appellant Petroleum Marketing Corporation.
 Philip L. Cohan, David Freeman, Ginsburg, Feldman & Bress, Washington, D. C., on brief, for appellant The Meadville Corporation.
 David A. Donohoe, Jay D. Zeiler, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., on brief, for appellant Society of Independent Gasoline Marketers of America.
 Frederic Freilicher, John J. Powers, III, Dept. of Justice, Washington, D. C. (John H. Shenefield, Asst. Atty. Gen., Rodney O. Thorson, James F. Ponsoldt, Dept. of Justice, Washington, D. C., on brief), for appellee, United States of America.
 Before FIELD, Senior Circuit Judge, and WIDENER and HALL, Circuit Judges.
 FIELD, Senior Circuit Judge:
 
 
 1
 On June 1, 1976, an indictment was returned in the District of Maryland against The Society of Independent Gasoline Marketers of America ("SIGMA"), Amerada Hess Corporation ("Hess"), Ashland Oil, Inc. ("Ashland"), Continental Oil Company ("Continental"), Crown Central Petroleum ("Crown"), Kayo Oil Company ("Kayo"), The Meadville Corporation ("Meadville"), Petroleum Marketing Corporation ("PMC"), Robert R. Cavin ("Cavin"), Norman Goldberg ("Goldberg"), Charles J. Luellen ("Luellen") and W. H. Burnap ("Burnap"). The indictment, drawn in one count, charged that the defendants had violated Section 1 of the Sherman Act, 15 U.S.C. § 1, prior to its 1974 amendments, by engaging in a conspiracy to fix prices for the retail sale of gasoline in unreasonable restraint of commerce.
 
 
 2
 After extensive pretrial proceedings, the trial commenced on May 2, 1977, and at the conclusion of the Government's case the district court granted the motions of three of the individual defendants, Luellen, Goldberg and Burnap, for judgments of acquittal. The trial continued as to the remaining defendants, and on August 30, 1977, the jury returned verdicts of not guilty with respect to Crown and Continental and guilty as to SIGMA, Hess, Ashland, Kayo, Meadville, PMC and Cavin.[1] Judgments of conviction were entered pursuant to the jury's verdicts and the convicted defendants have appealed.
 
 
 3
 In an opinion filed December 26, 1979, the panel unanimously affirmed the convictions of all of the defendants except Ashland. Similarly, the panel unanimously reversed the conviction of Cavin. With respect to Ashland, a majority of the panel affirmed the conviction, Judge Widener dissenting. Petitions for rehearing and rehearing en banc were filed, and upon the suggestion that the case be reheard en banc less than a majority of the judges in regular active service voted in favor thereof. Accordingly, rehearing en banc is denied. On the petitions for rehearing, however, a majority of the panel are now of the opinion that the conviction of Ashland must be reversed. Additionally, the panel is of the opinion that our disposition of Cavin's appeal must be modified. To that effect, we withdraw our prior opinion and file the present opinion in lieu thereof.
 
 
 4
 * During the period covered by the indictment, and for many years prior thereto, gasoline was sold to motorists through essentially two different types of retail service stations. "Major brand" stations sold the gasoline of major companies, e. g., Exxon, Texaco, Gulf, etc., and in many instances were operated by dealers who were not employees of the major companies. These stations bore brand names that were widely advertised and sold brand name products, including tires, batteries and parts. Many of them offered repair service and accepted recognized company credit cards. "Private brand" stations, on the other hand, offered gasoline under names which were not widely advertised, e. g., Redhead, Kayo, Scatt, etc., and were usually manned by individuals who worked directly for the company which owned the stations. Private brand stations ordinarily offered few products other than gasoline, and spent little money, if any, for media advertising.
 
 
 5
 With these differences in service, such stations competed with the major brands almost exclusively upon the basis of price. The private brand stations attracted customers from the majors by pricing their gasoline several cents a gallon below that of the major brand stations in the same locale, and as a result the price of major brand gasoline imposed a "ceiling" on private brand prices. In other words, to be competitive the private brand retailer was required to maintain a sufficiently attractive "differential" between his price and that of the majors. Because they were selling gasoline at less than that charged by the majors, the profit margin of the private brand stations was reduced to a marginal level, and the volume of a private brand's sales was vitally important. In the highly competitive private brand market volume was, of course, significantly related to price. As a result, the private brand company, in the operation of a local station, took into account in pricing its gasoline from day-to-day not only the price charged in that locale by the major brand stations, but the prices charged by other independents in the same market.
 
 
 6
 During the period in question the companies which operated private brand stations had available a certain amount of current and accurate data relative to pricing patterns in the major brand gasoline market from a publication known as "Platt's Oilgram". This established trade newspaper conducts price surveys of the majors and publishes such pricing data for major brand markets throughout the country, including advance announcements of upcoming wholesale price moves by the majors. Much information, however, which was vital to the private brand companies could not be gleaned from Oilgram. Oilgram carried little news of major brand retail price behavior on a station-by-station or "street-basis," and such information was highly important to the private brand companies since their competitive vitality depended upon the ability of their individual retail outlets to undercut at all times the prices charged by neighboring major brand stations. More significantly, Oilgram carried practically no news concerning other private brand retailers' price behavior, either present or future, nor any analysis of the potential impact of major brand market behavior upon the private brand market.
 
 
 7
 In part to fill this void, the private brand retailers formed a trade association called The Society of Independent Gasoline Marketers of America ("SIGMA"). SIGMA's members were firms and individuals operating private brand stations in various parts of the country. Its board of directors and officers were elected from the membership and its day-to-day operations were managed by a full-time salaried director and his supporting staff. Ordinarily the membership met in convention on a semi-annual basis. SIGMA was characterized at trial by the defendants as an "oral Platt's Oilgram" for independents. It collected information from various sources (including telephone calls to and from private brand companies in which the companies would discuss upcoming market decisions), and it would relay such information to its members, usually by telephone. Information provided by SIGMA to its members included the behavior of independents and majors in adjoining markets, the impact of wholesale prices on retail price structures, upcoming price moves by other independents, opportunities for increased prices or the perceived need for decreases, and generally such other data which might be of assistance to the members in meeting their competition.[2]
 
 
 8
 The indictment charged that the defendants, in effectuating the conspiracy to fix prices, "used SIGMA as a clearing house for gasoline pricing information in order to coordinate price increases and to eliminate discounting and settle pricing disputes," and that they "met at the occasion of SIGMA meetings and discussed pricing strategy, including the coordinated increase of retail gasoline prices and the curtailment and elimination of price cutting and discount practices". The indictment alleged that this use of SIGMA, supplemented by telephonic or other contact between the several defendants with respect to coordinated price increases and agreements, had resulted in the stabilization of artificial and non-competitive prices of gasoline, the effect of which was to restrain competition among the defendants and their co-conspirators.
 
 II
 
 9
 In their joint brief the defendants make the prefatory charge that they "were convicted of criminal price fixing for exchanging information on prices," and assert that no conviction has ever been sustained on such evidence in a highly competitive market of which the participants had a relatively minimal share. In making this contention the defendants draw heavily upon the Supreme Court's recent decision in United States v. U. S. Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Gypsum involved the practice of inter-seller price verification, a practice which is not, in itself, unlawful per se. The Government contended that such an exchange of price information was violative of Section 1 of the Sherman Act if it had either the purpose or the effect of stabilizing prices. The Court held, however, that an effect on prices, without more, would not support a criminal conviction, and that it was necessary to show that such a consequence was intended by the alleged participants.
 
 
 10
 There is a marked difference between the case before us and the one considered by the Court in Gypsum. Here the indictment charged the defendants with a conspiracy to fix prices, and the "exchange of information" was merely one of the activities by which the alleged agreement was effectuated. "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). Since in a price-fixing conspiracy the conduct is illegal per se, further inquiry on the issues of intent or the anti-competitive effect is not required. The mere existence of a price-fixing agreement establishes the defendants' illegal purpose since "(t)he aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." United States v. Trenton Potteries, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1926).
 
 III
 
 11
 The principal challenge of the defendants is that the Government failed to offer sufficient evidence to prove the conspiracy which was charged in the indictment. The indictment defined the geographical area of the conspiracy as the "Middle Atlantic states" of New York, Pennsylvania, New Jersey, Delaware, Maryland and Virginia, as well as the District of Columbia. The defendants maintain that it was necessary for the Government to demonstrate a single continuing conspiracy to fix gasoline prices throughout the entire Middle Atlantic region, and contend that the only evidence of the area-wide coordination of price moves related to general increases in November, 1970, July, 1971, and August of 1972. The defendants acknowledge that there were area-wide increases on those occasions, but assert that the evidence failed to show that they were the result of any price-fixing agreement. On the contrary, they suggest that the evidence clearly showed that the price moves on these three occasions were the result of economic forces at work in the market place over which the defendants had no possible control.
 
 
 12
 The defendants argue that other than those three occasions, the Government's evidence, at best, proved nothing but a series of "local and isolated incidents occurring within the Middle Atlantic states, involving some of the defendants and co-conspirators at different, and shorter, periods of time." Even if we were to accept the defendants' criticism of the probative quality of the evidence on the three area-wide increases, we think the Government's evidence with respect to the various local markets was proper for the consideration of the jury. Under the indictment the conspiracy embraced an agreement not only to fix prices on an area-wide basis, but also to establish prices in local markets within the region and to effectuate price changes on a coordinated basis. The Government's evidence of the single conspiracy implemented in this manner was not merely circumstantial in nature. The Government's witnesses, many of whom were employed by the corporate appellants, testified concerning the nature and intent of their pricing communications, and their testimony was augmented in many respects by the contemporaneous records of the defendants. Our review of the record persuades us that the evidence was sufficient to support the conclusion of the jury that the defendants were working together for the accomplishment of their common purpose to fix prices within the geographical area described in the indictment.
 
 
 13
 We are further of the opinion that the court's instructions to the jury were consistent with the indictment. The court instructed the jury that the defendants were charged with a "single, continuing conspiracy" to fix prices of gasoline in the Middle Atlantic states and, adverting to the evidence with respect to local pricing incidents, emphasized that "if you find that a defendant engaged in isolated incidents of gasoline price fixing, but was not a party to a single overall conspiracy covering the six-state area and the District of Columbia area, you must find that defendant not guilty of the matters charged in the indictment." This language, we think, made it crystal clear to the jury that their consideration of the evidence should be addressed to the ultimate issue of a single overall conspiracy.
 
 IV
 
 14
 Defendants also claim that there was a fatal variance of proof from the original indictment, the bill of particulars, and the pre-trial stipulation of the parties. Much of what we have said with respect to the sufficiency of the evidence applies equally to this contention of the defendants which, in a large degree, is predicated upon their argument that the indictment required a showing of continuous area-wide price manipulation. As we have noted, there was substantial evidence to support the jury's finding of guilt and, assuredly, the defendants were not convicted upon a charge that was not specified in the indictment, nor were they uninformed of the charge against them. Additionally, the charges and specifications found within the four corners of the indictment, the bill of particulars, and the pre-trial stipulation not only informed the defendants of the charges against them, but are sufficiently clear to allow the defendants to assert double jeopardy in the event of any future prosecution for the same conduct.
 
 V
 
 15
 We find no merit in the defendants' charge that the trial court improperly denied their request for a more detailed bill of particulars. Pursuant to a stipulation entered into five months prior to trial, the Government supplied the defendants with copies of all grand jury testimony, access to all documents subpoenaed from non-defendants; all documents voluntarily submitted to the Government by third parties in the course of the investigation; and all available Brady material. In further compliance with the stipulation the defendants received copies of all trial exhibits thirty days prior to trial, as well as a list of intended witnesses and Jencks Act material fourteen days prior to trial. In the light of this extensive disclosure by the Government there was no abuse of discretion by the trial court in declining to require the Government to supply the further information requested by the defendants. See United States v. Schembari, 484 F.2d 931 (4 Cir. 1973).
 
 VI
 
 16
 The Government's case against the defendant, Ashland, was based primarily upon the theory that Ashland exercised direct control over the retail operations of five of its subsidiary corporations, including Payless Stations, Inc. ("Payless").[3] One of the Government's principal witnesses on the question of Ashland's control was a former vice-president of Payless,[4] who was in charge of its pricing for the period from 1963 through 1973, and who was employed by the company from 1956 through December of 1973. This witness provided direct testimony of Ashland's control over its subsidiaries. His testimony also included other information regarding the participation of Ashland and Payless in the conspiracy and the relationship of Payless with SIGMA.
 
 
 17
 This key witness had been hospitalized for psychiatric problems on two separate occasions in Our Lady of Peace Hospital in Louisville, Kentucky, and counsel for Ashland subpoenaed the hospital records. They were produced by the hospital administrator who was directed to deliver them to the district judge. After examining the records in camera, the judge advised counsel that they reflected two periods of hospitalization, the first being from July 26 to August 29, 1966, and the second from November 20 until December 24, 1968 and that the hospitalizations involved "a mental disorder or illness at that time."
 
 
 18
 Concluding that the disclosure of the records was within his discretion, the district judge declined to deliver them to counsel for the reason, among others, that he did "not know to what extent the Government's examination of the witness will include questioning during the relative period" (App.Vol. 3, at 777, 778). In making this ruling, however, the district judge stated that he was not foreclosing counsel for Ashland from questioning the witness about the two periods of hospitalization, but that he would rule on the questions as the cross-examination of the witness developed.
 
 
 19
 The hospital records were sealed by the district judge and after this appeal was filed Ashland moved this court for leave to examine such records. The motion was denied with the provision that counsel for Ashland might renew the motion at the time of oral argument. Following oral argument we granted Ashland's counsel access to the records and they were jointly examined by counsel for Ashland and the Government. Based on this examination of the hospital records, with leave of the court, both Ashland and the Government filed supplemental briefs on the issue of the relevancy of these records.
 
 
 20
 Counsel for Ashland contends that in denying access to the hospital records the trial court prejudicially impaired Ashland's ability to effectively cross-examine the witness. Ashland argues, among other things, that the hospital records were significant for the purpose of evaluating the witness' perceptive ability during the period in question and suggests, for instance, that if the witness were suffering from paranoia, he might have taken an irrational view of his communications with Ashland and interpreted simple inquiries as commands or binding directives.
 
 
 21
 As we have noted, the first period of the witness' hospitalization was from July 26 to August 29 of 1966, which was prior to Ashland's acquisition of Payless and also prior to the alleged conspiracy. However, the second period of hospitalization from November 20, 1968, to December 21, 1968, fell within the period of the conspiracy which was alleged to have existed from at "at least as early as 1967 * * * and continuing thereafter until November 1974."
 
 
 22
 The record discloses that the vice-president in question was admitted to the hospital on the first occasion because of work-related problems. Significantly, the 1966 records show that a "supervisor" at work brought him to the hospital, and that he believed that "people at work were plotting against him." The official diagnosis indicated that his problems stemmed from his employment rather than being home-related. The 1968 records show that he was "manic depressed and admitted in psychotic state." The records also state that he "still tends to push himself," and contained observations that he was "delusional and hallucinatory with poor judgment and insight." Although the 1968 records do not specifically state that this was a continuation of his work-related problems, the jury might reasonably have drawn such an inference had the contents of the records been disclosed to them during the cross-examination of the witness. The official record incident to the 1968 visit state the final diagnosis as "Schizophrenic Reaction, Schizo-affective Type." On that occasion the "mental status examination" reflected that the patient was manic in behavior and quite talkative, and that he spoke of his experience with God.
 
 
 23
 It occurs to us that the hospital records should have indicated to the district court that the witness' hospitalization in 1966 was work-related and that it was quite probable that his 1968 illness was of a similar nature. The records should also have indicated to the court that the witness' judgment during both periods of illness was seriously impaired, and that a jury could have concluded that his ability to make rational observations was highly questionable. The records would further indicate that the patient had not fully recovered when he was discharged from the hospital in 1968 since they point out that his condition required further psychiatric treatment and continued medication.
 
 
 24
 Bearing in mind that the case against Ashland was based upon its alleged direct control over the retail operations of its subsidiaries, including Payless, it is clear that the testimony of the former vice-president was vital to the Government's case. Ashland had acquired control of Payless in 1967 and the witness testified that "Ashland, from the time that they acquired the company (Payless) until the time that I left, assumed gradually more and more control." At another point, in testifying concerning Ashland's control of prices of Payless the witness stated "this was a growing thing that started in 1968, when Ashland bought it and extended up until at the end, when they were saying what and where and how to price, not just because of the shortage of gasoline, but because they were taking direct control from Ashland's offices in Ashland, Kentucky." It should be noted that during at least a part of this period in 1968 about which the witness testified, he was experiencing acute mental problems with a hospital record which disclosed that he was "delusional and hallucinatory with poor judgment and insight," and was "secluded for his own welfare." Despite this fact, the court forbade Ashland from reviewing the hospital records or putting them to any effective use in the cross-examination of the witness.
 
 
 25
 Even if it is fair to assume that the hospital records had no direct bearing upon the witness' mental capacity at the time he testified, they were unquestionably relevant in regard to his perception of the events involving his work at Payless during the time of his unfortunate illness, and had a significant bearing upon his ability to testify at trial concerning his recollection of those events. United States v. Partin, 493 F.2d 750 (5 Cir. 1974), is the leading case in this field, and is quite similar to the case before us. In that case, one Rogers was a key government witness, just as the former vice-president was here. Rogers had been admitted to a Veterans Administration Hospital for treatment for mental illness. The hospital record revealed that Rogers had stated he was having auditory hallucinations and at times he thought he was some other person. The trial court rejected the admission of the hospital record either as a predicate for cross-examination or as a basis upon which another psychiatrist could have given an opinion as to the mental state of the witness Rogers as that may have had an effect on Rogers' ability to see and hear accurately during the period in which the events occurred about which he was testifying.
 
 
 26
 The court of appeals reversed the conviction because of the trial court's error in failing to admit the hospital records, reasoning at page 762:
 
 
 27
 "It is just as reasonable that a jury be informed of a witness' mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing. It all goes to the ability to comprehend, know, and correctly relate the truth."
 
 
 28
 And again on page 763 appears the following:
 
 
 29
 "Partin (the defendant) had the right to attempt to challenge Rogers' credibility with competent or relevant evidence of any mental defect or treatment at a time probatively related to the time period about which he was attempting to testify."
 
 
 30
 To the same effect are United States v. Hiss, 88 F.Supp. 559 (S.D.N.Y.1950), and statements in United States v. Honneus, 508 F.2d 566, 573 (1 Cir. 1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); Sinclair v. Turner, 447 F.2d 1158, 1163 (10 Cir. 1971), cert. denied, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972); Ramseyer v. General Motors Corp., 417 F.2d 859, 863 (8 Cir. 1969); United States v. Allegretti, 340 F.2d 254, 257 (7 Cir. 1964), cert. denied, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965).
 
 
 31
 In United States v. Figurski, 545 F.2d 389 (4 Cir. 1976), we had occasion to determine whether the contents of a protected report about a key prosecution witness should have been disclosed to defense counsel, and stated:
 
 
 32
 "If the report contains only material impeaching the witness, disclosure is required only when there is a reasonable likelihood of affecting the trier of the fact. Whether there is such a likelihood depends upon a number of factors such as the importance of the witness to the government's case, the extent to which the witness has already been impeached, and the significance of the new impeaching material on the witness' credibility."
 
 
 33
 Id., at 391-92. As discussed above, the former vice-president of Payless was the key government witness. Although the defense presented the testimony of two witnesses that contradicted his testimony regarding Ashland's control over its subsidiaries, the ability of defense counsel to impeach him regarding his ability to properly perceive events about which he testified was severely limited by counsel's inability to examine the hospital records. We can think of no more relevant or significant material than a hospital record indicating that a witness who is testifying against his former employer had been under treatment for mental illness which rendered him at that time delusional and hallucinatory with poor judgment and insight. Although a trial court should seek to prevent the disclosure of embarrassing, irrelevant information concerning a witness, it is an abuse of discretion to preclude defense counsel from obtaining relevant information, and the witness' privacy must yield to the paramount right of the defense to cross-examine effectively the witness in a criminal case. See Davis v. Alaska, 415 U.S. 308, 319, 94 S.Ct. 1105, 1111-1112, 39 L.Ed.2d 347 (1974).
 
 
 34
 Upon careful consideration, we are of the opinion that the action of the district court in denying Ashland access to the hospital records for its use in cross-examination of the former vice-president was so prejudicial that Ashland is entitled to reversal and a new trial.
 
 VII
 
 35
 With the exception of Ashland, we affirm the convictions of the other corporate appellants. We think, however, that assurances of immunity given to Robert Cavin during the grand jury's investigation and upon which he relied require that his conviction be set aside.
 
 
 36
 The grand jury investigation was initiated about November 18, 1974, under the direction of Rodney A. Thorson of the Anti-trust Division of the Department of Justice. On December 23, 1974, Cavin and Richard Reynolds, a fellow employee of SIGMA, were subpoenaed to testify before the grand jury and were jointly notified that they should appear in Baltimore on January 7, 1975. Reynolds and Cavin immediately contacted David A. Donohoe, who also represented SIGMA, and arranged to meet with him on January 2, 1975. Donohoe then called Thorson and inquired whether either Cavin or Reynolds were targets of the grand jury investigation. According to Donohoe, Thorson told him "not to worry" because Thorson "was obtaining immunity orders for both Mr. Cavin and Mr. Reynolds and that both would be testifying under a grant of immunity." Based upon Thorson's representation Donohoe concluded that he should suggest to Cavin and Reynolds that they obtain other counsel. In Thorson's recollection of the conversation with Donohoe, he denied making any "promise" that Cavin and Reynolds would receive immunity but recalled stating that he would obtain immunity orders for both if they intended to claim the Fifth Amendment. Thorson also acknowledged that he had requested immunity authorization for both witnesses at about the time he issued subpoenas for their appearance. Thorson also discussed with Donohoe his possible conflict of interest since he was counsel for SIGMA and suggested that Donohoe secure other counsel for Cavin and Reynolds.
 
 
 37
 At their meeting on January 2, 1975, Donohoe told Cavin and Reynolds of Thorson's assurance that they were to receive immunity, and advised them to obtain other counsel in order to avoid any possible conflict of interest. After some discussion, Donohoe recommended that Cavin and Reynolds consider retaining Donald T. Bucklin. Bucklin met with Cavin and Reynolds at Donohoe's office on that same day and was retained by them. Donohoe repeated to Bucklin the representations concerning immunity that Thorson had made to him. In the light of this information Bucklin discussed with Cavin and Reynolds their rights under a grant of immunity and they were specifically advised of the importance of testifying fully and honestly in order to obtain the maximum protection under 18 U.S.C. § 6001, et seq.
 
 
 38
 Shortly after the start of a joint briefing session with Cavin and Reynolds on the afternoon of January 2nd, Bucklin called Thorson to advise him of his representation of the two witnesses and to set up a meeting on January 3rd. During this conversation Thorson confirmed the assurance that both Cavin and Reynolds would receive immunity, and was advised by Bucklin that based upon this assurance he perceived no conflict in his joint representation. Thorson agreed that no conflict existed. While Thorson later denied discussing the question of conflict with Bucklin, he did acknowledge that he had repeated his earlier assurance that he would obtain immunity orders if the witnesses intended to claim the Fifth Amendment. On this point Thorson testified before the district court as follows:
 
 
 39
 THE COURT: Did you state that he would get immunity; he would testify pursuant to an immunity order?
 
 
 40
 MR. THORSON: Yes; yes, I did state that.
 
 
 41
 THE COURT: Can you restate that to me to the best of your recollection as to when it occurred and what was said and to whom.
 
 
 42
 MR. THORSON: I stated that initially in the telephone conversation preceding the January 3rd meeting in the context that if it is their intention to claim the Fifth Amendment I will obtain an immunity order. And I explained, expressly, that I had no intentions of having the Government go to the expense of having these people come to Baltimore from St. Louis, and then claim the Fifth Amendment and then I'd send them home. That's why I wanted to know what their intention was, and I did not find that out until the meeting on Friday. (January 3).
 
 
 43
 (App.Vol. 18, at 15,225 and 15,226.)
 
 
 44
 During the initial joint interview with Bucklin on January 3rd Cavin and Reynolds refreshed each others recollections, supplemented their respective comments and responses, and corrected each others memory of events, dates and names of people with respect to incriminating evidence. On January 3, 1975, Donohoe and Bucklin, together with another attorney, met with Thorson and other prosecutors in the Department of Justice. At this meeting Thorson agreed to obtain immunity orders prior to the grand jury appearances of Cavin and Reynolds based upon the representations that both witnesses would claim their Fifth Amendment privilege.
 
 
 45
 Subsequent to the meeting on January 3rd, a conflict developed in Bucklin's schedule for January 7th, and Terry F. Lenzner was brought into the case to represent Cavin and Reynolds. On January 6th Thorson called Lenzner and advised him that the appearance of the two witnesses was postponed until January 8th. During that conversation Thorson again confirmed that both witnesses would receive immunity, and it was agreed that the attorneys would meet on the morning of January 8th and proceed to the supervisory judge's chambers for the signing of the immunity orders. At about 7:30 p. m. on that evening Thorson called Lenzner at his home and advised him that the subpoena for Cavin was being cancelled. The reason given by Thorson for the cancellation was a scheduling problem and Lenzner was told that he would be advised if and when Cavin's appearance was rescheduled.
 
 
 46
 Under date of January 7, 1975, Lenzner advised Thorson by letter that his representation of Cavin and Reynolds was based upon Thorson's assurance that both individuals were to testify under a grant of immunity on the same day, and that because of a possible conflict of interest resulting from the cancellation of Cavin's subpoena, Lenzner was withdrawing from further representation of Cavin. Lenzner was unable to advise Cavin of these developments since both Cavin and Reynolds were en route to Washington. Cavin expressed some concern about the postponement but was assured by Lenzner that Thorson had indicated it was due only to a scheduling problem.
 
 
 47
 At the grand jury session on January 8th Thorson commenced his examination of Reynolds concerning SIGMA documents without an immunity order, whereupon Reynolds refused to answer "on the grounds that it violates the agreement between the Government and my counsel that I would be questioned only after receiving immunity and that I would be granted immunity today before testifying." Thorson then called upon Donohoe to produce someone to identify the SIGMA records, and the following exchange took place:
 
 
 48
 MR. THORSON: Well, do I understand that you, as counsel for SIGMA are refusing on behalf of SIGMA to produce someone
 
 
 49
 MR. DONOHOE: No, I'm not.
 
 
 50
 MR. THORSON: from that association to come here and testify, take an oath and testify as to the document production?
 
 
 51
 MR. DONOHOE: I think you know perfectly well what I'm saying. I brought two people to this City pursuant to subpoenas that you had directed, so I had two people who could have testified with respect to these documents, but because the commitments that you had made to these two individuals have not been kept, I'm no longer able to go get a third or fourth or fifth person. That's a situation which is not of my making.
 
 
 52
 MR. THORSON: Do I understand that you are refusing at this juncture to provide a person to make that production?
 
 
 53
 MR. DONOHOE: All I'm saying is that there are two people that have that I have brought that are capable to do that, but I'm willing to assure you that it won't do you any good because you failed to keep your commitment to obtain a proper order from the Court. You can take Mr. Reynolds or Mr. Cavin in here, but it's not going to do any good.
 
 
 54
 MR. THORSON: Mr. Donohoe, I think you can take SIGMA's documents with you now and would you so instruct, if he is your client, would you instruct Mr. Reynolds to appear before the Grand Jury now?
 
 
 55
 (App.Vol. 8, at M86 and M87.)
 
 
 56
 Reynolds was formally granted immunity later that day and testified before the grand jury. In his affidavit, Reynolds stated that during his grand jury appearances he was questioned and testified about matters he had earlier discussed with Cavin and that his testimony, at least in part, was based upon information Cavin had given him after they were told that both would receive immunity. In the process of obtaining an immunity order for Reynolds, Thorson showed Lenzner a document which reflected an authorization of immunity for both Cavin and Reynolds, and Lenzner concluded that Cavin was to be called later to testify under a grant of immunity. Under these circumstances, he perceived no conflict of interest, and debriefed Reynolds fully in the presence of Cavin. Some fourteen months later, in March of 1976, Reynolds was recalled as a witness before the grand jury and again discussed his testimony with Cavin, acting under the belief that neither he nor Cavin would be indicted. On June 1, 1976, Cavin was named as a defendant in the indictment.
 
 
 57
 These facts were largely undisputed and Cavin filed a motion in the district court alleging that the Government's conduct warranted dismissal of the indictment as to him. The court denied this motion, and Cavin filed an appeal. We dismissed the appeal, holding that the denial of the dismissal motion was not an appealable final decision within the meaning of section 1291. United States v. Cavin, 553 F.2d 871 (1977).
 
 
 58
 Our review of the record persuades us that the conduct of the Government cannot withstand the scrutiny of Cooper v. United States, 594 F.2d 12 (4 Cir. 1979), and United States v. Carter, 454 F.2d 426 (4 Cir. 1972). In Carter, the defendant alleged that incident to a plea bargain with the United States Attorney's office in the District of Columbia, involving certain stolen checks, he was promised that he would not be prosecuted elsewhere for anything having to do with the checks. We held that if such a promise was made as alleged and the defendant relied upon it, it was binding upon the Government and barred any subsequent prosecution for the stolen checks in the Eastern District of Virginia. We approved and applied the holding of United States v. Paiva, 294 F.Supp. 742 (D.D.C.1969), that
 
 
 59
 "if, after having utilized its discretion to strike bargains with potential defendants, the Government seeks to avoid those arrangements by using the courts, its decision so to do will come under scrutiny. If it further appears that the defendant, to his prejudice, performed his part of the agreement while the Government did not, the indictment may be dismissed,"
 
 
 60
 294 F.Supp. at 747.
 
 
 61
 In considering Cavin's dismissal motion, the district judge recognized that the principles of Carter were controlling, but concluded there was no promise of immunity by the Government, and "that Cavin (1) did not rely on the alleged promise and (2) to the extent such reliance is claimed it was not reasonable." In our opinion, the record does not support either of these conclusions. In reaching this conclusion, we hasten to point out that this is not a case of subjective wishful thinking on the part of either Cavin or his counsel. It is undisputed that the assurance of immunity was first given to Donohoe by Thorson in their telephone conversation on December 23, 1974, and was communicated to Cavin and Reynolds at that time. In the light of such assurance, from that date on Cavin's conduct and especially his interchange of information with Reynolds was influenced by the anticipated immunity. Donohoe recognized the validity of the promise when he resigned as counsel for Reynolds and Cavin due to the apparent conflict between them and SIGMA. As successor counsel for the witnesses, Bucklin had been advised of the immunity by Donohoe and received direct assurance to that effect from Thorson on the afternoon of January 2nd. Assuredly, Bucklin considered the promise to be viable when he conducted his joint conferences and briefings of Cavin and Reynolds in reliance thereon. Finally, on January 6th Thorson confirmed to Lenzner that both witnesses would receive immunity.
 
 
 62
 In giving these successive assurances to Cavin's attorneys, Thorson knew or certainly should have known, that both Cavin and his counsel would rely upon them and govern their conduct accordingly. The constitutional overtones of such a situation were recognized by Judge Phillips in Cooper v. United States, supra;
 
 
 63
 "To the extent that the government attempts through defendant's counsel to change or retract positions earlier communicated, a defendant's confidence in his counsel's capability and professional responsibility, as well as in the government's reliability, are necessarily jeopardized and the effectiveness of counsel's assistance easily compromised. (Footnote omitted) At the very least, these Sixth Amendment considerations add a heightened degree of obligation to the government's fundamental duty to negotiate with scrupulous fairness in seeking guilty pleas."
 
 
 64
 594 F.2d at 18, 19.
 
 
 65
 In concluding that Cavin's reliance upon the promise of immunity was unreasonable the district judge, drawing upon the law of promissory estoppel, observed that Thorson's assurance of immunity was a statement "of present intention subject to change for numerous reasons." Focusing upon Bucklin as an experienced attorney, the court charged him "with knowledge of the many variables involved in the immunity process," and concluded that "given these considerations and the facts of this case, reliance upon a purported promise of immunity before an immunity order has been signed and one has actually testified before the grand jury is manifestly risky and hence unreasonable." In our opinion the fallacy of this conclusion is that we are not primarily concerned with the gauge of Bucklin's professional caution or responsibility. The question is whether Cavin, as a layman, acted reasonably in relying upon Thorson's assurances of immunity, and our appraisal of such reliance should not be made on the basis of any fine-fingered legal analysis. As we observed in Cooper:
 
 
 66
 "constitutional decisions cannot be made to turn in favor of the government on the fortuities of communications or on a refusal to accord any substantive value to reasonably induced expectations that government will honor its firmly advanced proposals."
 
 
 67
 594 F.2d at 17. In our opinion the record in this case clearly required a finding that Cavin acted reasonably in relying upon the Government's promise of immunity.
 
 
 68
 Although he had found that there was no promise of immunity, nor any reasonable reliance by Cavin upon any such alleged promise, the district judge recognized the existence of a serious question with respect to Reynolds' testimony at trial. When counsel for the Government advised the court that he intended to use Reynolds to incriminate Cavin the court observed: "To the extent that Mr. Reynolds does not have an independent recollection of any statement that Mr. Cavin made to him and acquired that recollection through the so-called briefing, if that is what it was, it seems to me that that statement might well be suppressed." In discussing the procedure to carry out this ruling, the court advised counsel that he would "take it on a line by line basis" as the trial progressed. An examination of the record discloses that Reynolds' recollection covering several years was inextricably intertwined with the information which he had received from Cavin concerning SIGMA'S operations either in the joint briefing sessions or otherwise. This was illustrated when, during the course of his testimony, he stated: "My own independent recollection I have been briefed and debriefed, before the Grand Jury and quizzed and requizzed, and I am not sure what is my own independent recollection." (App.Vol. 5 at 1477). In our opinion, the Government's use of Reynolds as its principal witness against Cavin after the two of them, acting pursuant to the assurances of immunity, had worked together so closely in their review of SIGMA's operations was violative of the basic concept of fundamental fairness. The lodestar of Carter was stated by Judge Winter as follows:
 
 
 69
 "There is more at stake than just the liberty of this defendant. At stake is the honor of the government, public confidence in the fair administration of justice, and the efficient administration of justice in a federal scheme of government."
 
 
 70
 454 F.2d, supra, at 428.
 
 
 71
 In our original opinion we concluded that the fair administration of justice required not only that Cavin's conviction be reversed but that the case be remanded with instructions to dismiss the charges against him. Upon reconsideration, however, we are of the opinion that this relief was too broad and was at variance with the observations made by us in United States v. Cavin, supra. In the course of our consideration of Cavin's abortive appeal we stated:
 
 
 72
 "In contrast to the Double Jeopardy Clause's prohibition against retrial, the remedy to vindicate the Fifth Amendment's protection against self-incrimination is much more circumscribed. One who claims that his confession or other incriminatory statements have been illegally obtained by promises of leniency, deception, or coercion is not entitled to avoid trial by securing dismissal of his indictment. His remedy is suppression of his statement."
 
 
 73
 553 F.2d, at 873. This observation accords with the pronouncements of the Supreme Court in this area. See United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966); Lawn v. United States, 355 U.S. 339, 348-50, 78 S.Ct. 311, 317-318, 2 L.Ed.2d 321 (1958).
 
 
 74
 Unlike the situation in Carter, supra, the Government made no promise to Cavin that he would not be prosecuted. The record indicates only that the Government assured Cavin of immunity, and the only type of immunity which could have been offered to him was that prescribed by 18 U.S.C. § 6002. The statute authorizes only use immunity, not transactional immunity, and the grant of use immunity does not justify dismissal of the indictment. If it elects to do so, the Government can still proceed with the prosecution but cannot use any evidence or the derivative of any evidence which it has obtained through the grant of immunity. "(S)uch immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader." Kastigar v. United States, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972).
 
 
 75
 Accordingly, Cavin's conviction is reversed and his case is remanded to the district court for a new trial if the Government so elects. In the event of a new trial the district court should not permit the Government to offer any evidence directly or indirectly derived from Cavin which resulted from its assurance of immunity to him and Reynolds.
 
 
 76
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 
 WIDENER, Circuit Judge, concurring:
 
 77
 While I concur in the opinion, I would add a word.
 
 
 78
 At trial, the prosecution played to the jury a tape recording of an alleged telephone conversation between one Joseph Painter, a government witness and former employee of Hess, and Norman Goldberg, former marketing coordinator for defendant Amerada Hess Corporation. The government contended that this conversation was evidence of the price-fixing conspiracy. Although numerous parts of the tape were inaudible,[1] the government was not only allowed to introduce into evidence the tape but was also allowed to give to the jury, not as evidence but as an "aid," a transcript of the tape, the origin of which transcript was not certain and which in plain terms was merely a statement of what someone (apparently the transcriber) thought the tape said.
 
 
 79
 The prosecution was also allowed to introduce a controversial tape of a speech made at a SIGMA meeting by one Teak, the Executive Director of SIGMA, who was deceased at the time of trial, and a transcript of the tape, the origin of which transcript was also not definitely determined. This Teak tape, only parts of which were played to the jury, was extremely damaging to the defendants' case.
 
 
 80
 Where a tape recording has been made of an admissible conversation, even if the tape may be admissible, I feel that a transcript of the tape should not be. Neither should it go to the jury as an "aid." Although our decision in this case, while not in terms, follows the circuit rule that such transcripts are admissible, United States v. Hall, 342 F.2d 849 (4th Cir. 1965), I think it is quite unfair and prejudicial to the party against whom the evidence contained on the tape is offered. It is known by all that a paper writing adds a kind of authenticity to any statement. In addition, the jury has access to that testimony while in the jury room, if admitted into evidence. All of this leads me to the conclusion that by permitting a transcript of a recorded tape to be introduced into evidence or by permitting its use as an aid, undue emphasis is placed on the testimony represented by the tape recording, and amounts to nothing more than the transcription for the jury of the testimony of one witness to the exclusion of that of others. I think our rule on this question is incorrect and would have granted rehearing en banc, changed the rule, and awarded a new trial on this account.
 
 
 81
 Having received not near enough support to prevail on the proposition voiced just above, I have not dissented, and make no attempt to detract from the opinion except to voice my disagreement with the established circuit rule.
 
 
 82
 K. K. HALL, Circuit Judge, dissenting in part:
 
 
 83
 The majority has concluded that Ashland Oil was entitled to reversal and a new trial because the hospital records of a key government witness were not made available for use in cross examination. I respectfully dissent. In my opinion, the district court acted within its discretion to protect the rights of all parties involved.
 
 
 84
 As the majority observes, the trial judge reviewed the records in camera and advised counsel that they revealed two periods of hospitalization, the first being from July 26 to August 29, 1966, and the second from November 20 until December 24, 1968. The judge correctly advised counsel that the hospitalizations involved a "mental disorder or illness." Acknowledging that the government's examination might enter the periods of hospitalization, the judge clearly gave Ashland the option to cross examine the witness about his hospitalizations. The judge also gave the following assurance:
 
 
 85
 "If it appears to me that the witness answers any questions in a manner which the records contradict, then I will consider, of course, making that particular bit of information from the psychiatric records available to you; not giving you the records, but advising you in that respect what it is.
 
 
 86
 In the event the witness answers in ways that I would believe to be contradicted by the records in any way, I would call that to your attention, * * *."
 
 
 87
 (App.Vol. 3, at 779).
 
 
 88
 Having reviewed the witness' testimony and the hospital records, I discern no reversible error. The hospital records had no bearing upon the witness' competency to testify at the time of trial. At best, they would only show that his judgment at the very beginning of the conspiracy period might have been impaired a matter which was adequately revealed to the jury on cross-examination. Two periods of psychiatric hospitalization necessarily indicate that a patient's judgment at that time and possibly for some period thereafter would be somewhat impaired, and the jury was well aware of this fact and its implications. Additionally, and significantly, I think, counsel for Ashland failed to avail themselves of the offer of Judge Blair to cross-examine the witness on the possible effect his illness had on his perceptive abilities and his attitude toward his colleagues in Payless and Ashland during the operative period. The failure to make such an exploration cannot be attributed to the lack of the hospital records for counsel vigorously questioned the former officer concerning his hostility toward his colleagues and Ashland indicated in argument to the district court its awareness that paranoia might have colored the witness' perception.
 
 
 89
 I think that the district judge acted appropriately and discreetly in declining to open up the hospital records in their entirety. These are typical hospital records, with some of the entries being handwritten and others typed; some legible and other illegible; they include nurses' notes, tentative diagnoses and comments by the physician, as well as notations of medication and treatment. To place all of this material in an intelligent perspective, both as it related to the period of the conspiracy and the time of the witness' appearance in court, would have required expert testimony. At the time of trial the attending physician was deceased, and the introduction of this material would merely have led the jury into a confusing collateral thicket. Whether such an excursion should be permitted rested in the sound discretion of the trial judge and in my opinion, he properly declined to countenance it. Based upon my examination of the record, I perceive no "reasonable likelihood" that the hospital records would have had any material effect upon the jury's determination of the issues in this case. See United States v. Figurski, 545 F.2d 389, 391 (4th Cir. 1976).
 
 
 90
 I concur in the remaining parts of Judge Field's opinion.
 
 
 
 [1]
 Cavin was employed by SIGMA in January of 1972 and was appointed Executive Director of the Society in November of that year
 
 
 [2]
 SIGMA also lobbied on behalf of its members, conducted public relations programs, and informed members of adoption and interpretation of government regulations. It is, of course, conceded that none of these activities were germane to the charges in the indictment
 
 
 [3]
 The other subsidiaries were Hi-fy Gasoline Stations, Inc.; Bi-lo Stations, Inc.; Southern Oil Co.; and Red Head Oil Co
 
 
 [4]
 This witness will be referred to from time to time as the "witness", "vice-president", "key-witness", or "former vice-president."
 
 
 [1]
 Joint Appendix Vol. 7, p. 1966-1975 reveals 119 inaudible portions in 91/2 pages of transcript. Hall, infra, had 25% inaudible, p. 853