**PARLTON et al. v. UNITED STATES.**

No. 6176.

United States Court of Appeals for the District of Columbia.

Argued Jan. 7, 1935.

Decided Feb. 4, 1935.

ROBB and HITZ, Associate Justices, dissenting.

---

P. H. Marshall and Frederick J. Rice, both of Washington, D. C., for appellants.

Leslie C. Garnett, U. S. Atty., and H. L. Underwood, both of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Appellants were convicted of arson and sentenced to imprisonment in the penitentiary. They have appealed, and assign numerous alleged errors occurring in the trial of the cause, which they claim entitle them to a reversal of the judgment.

The United States, acting through the Attorney General, has filed a confession of error in respect to appellants' assignments Nos. 7 and 8. The Attorney General also submitted a written statement, in which he tells us he has personally reviewed the record and evidence and has confirmed his conclusions by a supplemental investigation of various phases of the case, as the result of which he does not feel justified in asking that the judgment be affirmed.

In the circumstances, we were in some doubt if it was incumbent upon us to look into the record with a view of forming any judgment of our own whether there be error or not. We have therefore examined the cases as fully as possible in the time available, to ascertain the views of other courts where the question has arisen. We find that in England in the trial of John Wilkes, Lord Mansfield, referring to the case of Lord Griffin, charged with outlawry for high treason, said that Sir Philip Yorke, the Attorney General, came into court and said he had a sign manual "to confess the errors and consent to the reversal." The court told him, "his confessing an error in law would not do: they must judge it to be an error," for their judgment would be a precedent. 4 Burrows 2527, 2551.

In the Supreme Court the question seems never to have been discussed, although in Fauntleroy v. Elmer Candy Co., 278 U. S. 664, 49 S. Ct. 177, 73 L. Ed. 570, and in Lillian Weare v. United States, 276 U. S. 599, 48 S. Ct. 321, 72 L. Ed. 724, the former a civil and the latter a criminal case, a reversal was ordered on a confession of error by the Solicitor General; and the rule in the state courts is not uniform. In Washington state, Oklahoma, Illinois, North Carolina, and Missouri the opinion

is expressed that the record should be looked into. See State v. Green, 167 Wash. 266, 9 P.(2d) 62; Bindrum v. State, 27 Okl. Cr. 372, 228 P. 168; People v. Mortenson, 224 Ill. App. 221; State v. Stevens, 153 N. C. 604, 69 S. E. 11; State v. Goddard, 146 Mo. 177, 48 S. W. 82.

In California, Colorado, and Iowa the conclusion reached is that the filing of a confession justifies a reversal without more. People v. Lewis, 127 Cal. 207, 59 P. 830; Zancannelli v. People, 63 Colo. 252, 165 P. 612; State v. Hogan, 85 Iowa, 712, 50 N. W. 880. But see People v. Mooney, 175 Cal. 666, 166 P. 999; Id., 176 Cal. 105, 167 P. 696, in which a confession of error by the Attorney General was held insufficient.

■■ In this case we have no doubt of the propriety of the action taken by the Attorney General. Nor do we think it can be questioned that he has the power, as the representative of the government, to confess error in any case in which he is satisfied the ends of justice demand it. The power is inherent in the office. Here, as he tells us, he has caused an independent investigation to be made which satisfies him the defendants are innocent of the crime of which they were convicted. In that case it was manifestly his duty to confess error. The public interests and the principles of justice would be satisfied with nothing less; but even so, we cannot, as we think, alone on the strength of his official action acquit ourselves of our responsibility to examine the whole record before setting aside a conviction for crime. The question, as we think, is wholly different from that which would arise in a litigation between private parties, where no public interest is involved. In this view, we feel impelled to review the errors alleged.

■ Appellants at the time of the fire were members of a college fraternity and resided in the fraternity house in the city of Washington. At 4:20 a. m. of July 9, 1933, the fire was discovered and the alarm sounded. The city fire department succeeded in extinguishing the fire before very great damage was done, and it was then ascertained that the fire had started in the hallway and living room on the first floor, and also in an upper bedroom in which defendants lived. The evidence tending to connect defendants with the crime consisted of (a) evidence regarding the nature of the fire as one started by the use of gasoline; (b) an alleged purchase of gasoline by the defendants before the fire; and (c) identification

of a milk can found on the premises where the fire occurred as the can in which defendants are alleged to have carried the purchased gasoline. No witness testified to seeing either defendant at the fraternity house after 7:30 p. m. of the day preceding the fire, but a witness employed temporarily at a gasoline station identified defendant Parlton as one of the two young men who had purchased ten gallons of gasoline in a milk can between 1 and 4 o'clock on the morning of the fire and taken it away in their automobile. Another of the attendants at the gasoline station, though unable to identify either defendant as the purchaser of the gasoline, identified the can found on the premises as the can into which the purchased gasoline was put, and the same witness identified the defendant Smith's Chevrolet car as the one which he saw at the service station when the gasoline was purchased.

That the fire was incendiary, and that it was started by the use of gasoline, was convincingly proved. An attempt was made to prove motive; as against the defendant Smith, that as treasurer of the fraternity he was short in his accounts and that the fire in his room was intended to destroy the evidence of his shortage, and as to the defendant Parlton, that his "pledge" to the fraternity had not been consummated by actual election and that during the period of his pledgeship he had not commended himself to some of the members of the fraternity. The evidence in the case of Parlton was vague and insufficient as a motive for such a crime. In the case of Smith there was an actual shortage in his accounts of approximately $75, but even as to this it was shown that part of the money had been, following a more or less common custom, loaned to other boys in the fraternity.

Defendants took the stand in their own behalf and denied all connection with or knowledge of the fire. They testified they left the fraternity house in an automobile belonging to defendant Smith around 8 o'clock in the evening of July 8, and did not return until the next evening about 9. They went first for a young lady with whom one of them had an engagement, and then drove with her to Rockville, Md., where they were joined by another young lady. From Rockville they drove in the direction of Frederick, and thence back to the home of one of the young ladies in Rockville. Then the two defendants and the other young lady

drove back to Washington. After delivering the latter at her home, defendants Smith and Parlton went immediately to an all night restaurant on Fourteenth street near Thomas Circle, where they had something to eat. It was then around 3 o'clock. Up to this point the facts, as we have stated them, are undisputed. While at the restaurant, Parlton reminded Smith of a broken engagement the preceding Sunday with a young lady living in New Freedom, Pa., and suggested that they start for New Freedom, go to a hotel, get a little sleep, and then make good their broken engagement. They testified that, in accordance with this program, they left Washington via Rhode Island avenue, and thence on the Baltimore Pike to Baltimore. In Baltimore they stopped at a filling station to buy ten gallons of gasoline for use in the car. After driving through Baltimore, they continued north on the York road in the direction of New Freedom, and, when a short distance outside of Baltimore, the engine of the automobile developed trouble; and they were obliged to slow down until they reached Gunpowder Falls bridge, 67.8 miles from Washington, where they parked their car and left it, intending to reach a telephone to obtain a mechanic to repair the engine. Close to the bridge was a small inn kept by Mr. and Mrs. Schultz. They knocked on the front door of the inn, and Mrs. Schultz, who was wakened by the knocking, came to the window. Smith requested permission to use the telephone, and Mrs. Schultz replied there was no telephone in the house, but informed him there was a garage in Hereford, two miles back in the direction from which they had come. Upon receiving this information, Parlton returned to the car and Smith started to walk back in the direction of the garage, but after he had gone a short distance he was picked up by the driver of a passing automobile, and reached the Hereford garage just as Winemiller, the owner, was opening the place for business. At Smith's request Winemiller borrowed a neighbor's car and drove with Smith to Gunpowder Falls bridge. The two defendants and Winemiller then returned to the garage with the car, and Winemiller made temporary repairs, as a result of which defendants were able to proceed on their way.

The exact time at which these incidents occurred is, of course, the vital point in the case. Mrs. Schultz, who was called in rebuttal on behalf of the United States, testified that her conversation with defendant Smith took place around daybreak, which at that season of the year was some time between 4:15 when "civil twilight" commenced" and 4:45 when the sun rose. Her testimony is that she was wakened and went to the window. "There was a young man standing on the road who asked her if she had a telephone, and she said 'No'; he said, 'Where is the nearest garage', and she said, 'On top of the hill.'" He left the window and went to the road, and it appeared that he waited there a few minutes. This was just around daybreak. She could not tell the time, but it was just light enough for her to see the young man down on the road.

Winemiller fixed the time at which Smith arrived at the garage as not later than 5:35 a. m. He testified that before retiring the preceding evening he had set his alarm clock for 5:20; that he immediately rose and dressed; and about fifteen minutes after the alarm rang Smith came to the garage.

Winemiller's wife testified that when her husband got up the morning in question it was twenty minutes after five.

Presley, whose car Winemiller borrowed to take him and Smith back to the stranded automobile at the bridge, testified he could not fix the exact time, but it was "pretty early."

As has been stated, the distance between Thomas Circle in Washington and the bridge at which the breakdown occurred was 67.8 miles. The distance back to the garage, where Smith secured Winemiller's services, was two miles. Hence it is obvious that if the time at which Smith reached the garage was actually 5:35, and if the fire was started by the defendants at 4:15, the trip from Washington through Baltimore to Gunpowder Falls bridge and then back to the garage partly on foot and partly by automobile must have been accomplished in one hour and twenty minutes.

Based on the impossibility of this, defendants at the conclusion of all the evidence asked for binding instructions, which the trial court refused and which the Attorney General says was error in law. But the Attorney General also tells us that, in an endeavor to answer the question whether the defendants could have left Washington after the fire started and reached the Winemiller garage at the time Winemiller and his wife testified they did, he caused a practical test to be conducted

by the Division of Investigation of the Department of Justice. Two agents of the Division, in a car exactly like the one used by the defendants, made the trip at as high a speed as possible, following the same route taken by the defendants. They left Thomas Circle at 4:15 a. m., arrived at Gunpowder Falls at 5:50 a. m., and at the Winemiller garage at 5:54 a. m. The time consumed was one hour and thirty-nine minutes. To have reached the garage at 5:30 they would have had to leave Washington at 3:51, which by general agreement was at least twenty minutes, and probably twenty-five minutes, before the fire started. Having regard to the fact that the three or four witnesses who testified as to the incidents occurring at and around Gunpowder Falls were wholly disinterested and, so far as the record shows, reputable and reliable persons, it may well be that the defendants might reasonably have expected that the trial judge would take the case from the jury; but in this brief sketch of the evidence we have followed only the general outline. Inevitably in the trial of a criminal case there occur incidents in themselves trivial but which, when fitted into the completed picture, create an atmosphere tending to credit or discredit the testimony of witnesses. It is the recognition of this condition that induces appellate courts to say that the trial judge and jury are best qualified to determine the credibility of witnesses and the weight to be given to their testimony.

There were a number of such incidents in the course of this trial. Here, it is quite true, there was no direct evidence to connect the defendants, or either of them, with the starting of the fire, but there was evidence, if the court and jury believed it, of the purchase of gasoline shortly before the fire was started and of the presence of the container of the gasoline in the garage of the premises in which the fire started. This evidence, while circumstantial, when considered in connection with the incendiary character of the fire through the use of gasoline, the presence of the fire in two places, one of the places being the desk of the bedroom of the defendants where the account books of the fraternity were kept, can hardly be said not to be substantial evidence to be considered by the jury.

To meet this, defendants endeavored to prove an alibi, and the measure of their success depended largely upon the evidence of witnesses whose opportunity to determine the precise time of the incidents they testified to and whose reliability and truthfulness were manifestly questions for the jury. In these circumstances, and disregarding, as of course we must disregard, the facts outside the record upon which in a measure at least the action of the Attorney General is predicated, we should be slow to reverse, notwithstanding we ourselves may have a reasonable doubt of guilt. Johnson v. United States, 157 U. S. 320, 15 S. Ct. 614, 39 L. Ed. 717. But, as it happens in this case, we need not weigh the doubt nor pursue the question we have discussed further, for it appears to us there was a fatal error committed in the trial of the cause which, irrespective of all else, requires us to reverse and remand. This error occurred in the admission by the trial court of certain evidence in relation to the condition of defendant Smith's automobile at a time ten days after the fire. The evidence of the filling station attendants, to which we have referred, was that two young men came to the station in a Chevrolet car in the early morning of July 9th and purchased ten gallons of blue gasoline; that the can containing the gasoline was put into the automobile on the floor behind the front seat. Ten days after the fire the police removed a felt pad about a quarter of an inch thick under the mat in the rear part of the automobile. It was photographed and showed a blue stain, and on proof that the pad had been lost by the police the photograph was admitted in evidence. Not only this, but a government witness, described as a microanalyst, was allowed to testify that, as a result of a chemical test made upon a piece of the pad, he had found blue coloring in the felt similar to the blue coloring in the gasoline found in the milk can identified as having been furnished by the filling station when the gasoline was bought. Another photograph of the mat, also with stains, taken from the floor of the automobile, was offered and received in evidence, all over defendants' objection and exceptions.

It is obvious, we think, that the trial judge received these articles in evidence and allowed the chemist to testify as to their condition upon the assumption that the government would prove that the condition when taken out of the car was the same as at the time of or immediately after the fire, but no such evidence was offered. Ten days had elapsed since the fire, and the uncontradicted evidence was that the defendant Smith had allowed other persons to use

his automobile both before and after the fire, and that practically every one in the fraternity had used it at various times and on various errands. Blue gasoline is an article of general use, and its presence in the pad may have happened in any one of many ways with none of which the defendants had any connection. In these circumstances to permit the jury to infer that because of a blue stain on the mat the defendants had purchased blue gasoline on July 9th, without any evidence to show that the stain was there at the time of or immediately after the fire, would be to violate one of the fundamental rules of evidence. The law requires, particularly in a criminal case, an open and visible connection between the principal or evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences. Manning v. Insurance Co., 100 U. S. 693, 698, 25 L. Ed. 761. It has been frequently said that proof of the existence of a given condition raises no presumption of its previous existence.

In Inhabitants of Hingham v. Inhabitants of South Scituate, 7 Gray (Mass.) 229, 232, Judge Bigelow, speaking for the court, said: "The law presumes that a fact, continuous in its nature and character, like domicil, possession or seisin, when once established by proof, continues; and, in the absence of evidence to the contrary, legally infers therefrom its subsequent existence. But we know of no rule of law which permits us to reason in an inverse order, and to draw from proof of the existence of present facts any inference or presumption that the same facts existed many years previously." And in Dixon v. Dixon, 24 N. J. Eq. 133, 134, which was a suit begun by a husband to set aside a deed made to his wife upon the ground that before the deed was made she had been guilty of adultery, the court said: "That she afterwards lived in adultery with the man charged to have been her paramour before the making of the conveyance, is too clear for doubt; but her subsequent bad life cannot authorize the inference of her prior guilt, without additional proof." And in Blank v. Township of Livonia, 79 Mich. 1, 5, 44 N. W. 157, 158, the Supreme Court of Michigan said: "A state of facts once existing is sometimes and usually presumed to continue, but they are not presumed to have always existed." See, also, W. F. Corbin & Co. v. United States (C. C. A.) 181 F. 296.

Here, as we have already seen, the evidence to convict was circumstantial. One of a group of three attendants at a gasoline station had identified one of the defendants as the purchaser of bulk gasoline. The others, with the same opportunity, were unable to identify either. In this condition of the proof some inconsequential detail, unimportant in itself, might very well turn the scales. It was, therefore, the duty of the trial judge to be watchful to see that no extraneous or improper evidence got before the jury lest it might influence their minds and prejudice the legal rights of the accused, and as there was a failure in this regard, we are obliged to declare it error.

Nor can it be properly contended, as was suggested in the original brief of the government, that the error was harmless. The generally applied rule is that when error appears in the record it is presumed to be injurious unless it appears beyond any doubt that it did not and could not prejudice the rights of the parties. In this case, in view of the fact that the evidence of guilt was circumstantial and that the alleged purchase of blue gasoline just prior to the fire, together with the presence of the container in the garage, was substantially all there was to connect defendants with the crime, it is perfectly manifest that the stain in the pad, indicating the use of the car in the transportation of blue gasoline, may very well have been the deciding circumstance in the jury's mind. And while it may be argued that only ten days elapsed between the fire and the examination of the automobile, still that fact is not conclusive. Admittedly, the time was sufficient to have wrought a change in the condition of the car. There was ample opportunity for others, either designedly or accidently, to have spilled blue gasoline or some other blue substance on the floor, and this was enough to make it the duty of the trial court to reject the evidence, when neither proof nor offer of proof was made by the government to show that the conditions found on the 19th and 20th were those which existed on the 9th.

Because of error in the admission of this evidence, we must reverse the judgment and award a new trial.

Reversed and remanded.

ROBB and HITZ, Associate Justices, dissent.