938 F.2d 1343
 291 U.S.App.D.C. 84, 33 Fed. R. Evid. Serv. 721
 UNITED STATES of America
v.
Michael PRYCE, Appellant.
UNITED STATES of America
v.
Nathaniel M. GASKINS, a/k/a Andre Michael Redman, "Terry",
Appellant.
UNITED STATES of America
v.
Calvin L. THOMAS, a/k/a "Peter", Appellant.
UNITED STATES of America
v.
Antonio DONOVAN, a/k/a Howard Turner, Donovan Antonio,
"Jerry", Appellant.
 Nos. 89-3124, 89-3133, 89-3132 and 89-3134.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 21, 1991.
Decided July 16, 1991.
As Amended on Denial of Rehearing
and Rehearing En Banc
Sept. 20, 1991.
 
 Curt Hansen, with whom Greta Van Susteren (appointed by the Court) was on the brief, for appellant Michael Pryce in No. 89-3124.
 Diane S. Lepley (appointed by the Court), with whom David B. Smith was on the brief, for appellant Nathaniel M. Gaskins in No. 89-3133.
 Allan P. MacKinnon (appointed by the Court) for appellant Calvin L. Thomas in No. 89-3132.
 Jensen E. Barber (appointed by the Court) for appellant Antonio Donovan in No. 89-3134.
 Robert A. De La Cruz, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Brenda J. Johnson, Asst. U.S. Attys., were on the brief, for appellee.
 Before SILBERMAN, WILLIAMS and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 Concurring opinion filed by Circuit Judge RANDOLPH.
 Opinion dissenting in part filed by Circuit Judge SILBERMAN.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 On May 2, 1989 a federal jury convicted Michael Pryce, Calvin Thomas, Donovan Antonio, and Nathaniel Gaskins of committing various drug and firearm crimes.[1] They appeal their convictions on a number of grounds. We reject all of their arguments save one: that the trial court improperly prohibited defense counsel from questioning a government witness about his history of hallucinations. On these grounds, we reverse the conviction of Nathaniel Gaskins.
 
 
 2
 * * *
 
 
 3
 On December 20, 1988 the police raided Marguerite Briscoe's apartment in Southwest Washington. There they found Thomas and Pryce, along with much crack, a little over $2000 in cash, and a nine-millimeter pistol. They also found, among other people, Briscoe's son Reginald Chandler and Reginald's cousin Anthony Chandler. Several weeks later, the police arrested the other two defendants (Antonio and Gaskins) in a nearby apartment and charged them with involvement in the drug ring.
 
 
 4
 At trial, the government offered as its principal witnesses the police officers who conducted the December 20 raid, and--for an insider's view of the drug ring--Briscoe and the two Chandlers. (Reginald, and perhaps Anthony, testified under a grant of immunity from the government.) According to the insiders, Thomas, Pryce and Antonio began living in the apartment and using it as a drug distribution center around the beginning of December, at which time Briscoe moved out. Business grew. According to Reginald, Gaskins arrived about a week or ten days later "to work with" Antonio, and then left about a week after that. The testimony generally suggested that Thomas and Pryce were the leaders of the operation, while Gaskins and Antonio were, by comparison, bit players with look-out and perhaps enforcement roles.
 
 
 5
 * * *
 
 
 6
 Our first--and most important--issue concerns the trial court's decision to prohibit defense counsel from cross-examining Anthony Chandler on his past hallucinations. Just before his cross-examination, Gaskins's lawyer told the court that he had access to a psychiatric report, dated September 26, 1988, stating that Anthony had been seeing and hearing nonexistent events. After some preliminary discussion, the court and the lawyer had this colloquy:
 
 
 7
 THE COURT: I would say this. I will let you ask him if he suffered any during the relevant time frame, but you may not go into that report or anything he may have told a psychiatrist.
 
 
 8
 MR. HAND: Very well.
 
 
 9
 THE COURT: I think, as I said, you can test the credibility of the witness and you can test the ability of the witness to observe. So you can ask him, if you want to take that risk, because it is risky.
 
 
 10
 MR. HAND: Well, may I ask him, "Do you suffer from"--
 
 
 11
 THE COURT: No.
 
 
 12
 MR. HAND: "Do you ever hear things and see things that aren't really there?"
 
 
 13
 THE COURT: Only during the time frame that he has discussed, December 1 through December 20. You can run the risk if you wish.
 
 
 14
 MR. HAND: Very well.
 
 
 15
 5/4 Tr. at 106-07. The trial court effectively ruled that any cross-examination of Anthony on his mental condition would have to begin and end with questions about that condition as it existed in December. The court thus apparently barred defense counsel from asking any questions about Chandler's hallucinations in September as a foundation for questions about his condition in December, much less as a basis for impeaching his responses about December. The court gave no explanation for its ruling.
 
 
 16
 This restriction was an abuse of the trial court's discretion to limit cross-examination on matters affecting credibility, see, e.g., United States v. Partin, 493 F.2d 750, 762-64 (5th Cir.1974); United States v. Society of Independent Gasoline Marketers of America, 624 F.2d 461, 467-69 (4th Cir.1979), and violated the confrontation clause of the sixth amendment, see Delaware v. Van Arsdall, 475 U.S. 673, 679-80, 106 S.Ct. 1431, 1435-36, 89 L.Ed.2d 674 (1986); Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); United States v. Lindstrom, 698 F.2d 1154, 1163-68 (11th Cir.1983).[2] Hallucinations in September are obviously relevant to a witness's ability to discern reality in December. See, e.g., Partin, 493 F.2d at 762-64 (reversing conviction because trial court excluded evidence that government witness suffered from mental illness four months before relevant events). Physical impairments--a witness's being blind or deaf, or just myopic or hard of hearing--have long been proper subjects of impeachment. See 3 David W. Louisell & Christopher B. Mueller, Federal Evidence Sec. 342, at 485 (1979) (citing cases). Courts have extended that principle to evidence of mental illnesses that do not directly impair a witness's perception, reasoning that such evidence also affects a witness's credibility, though more obliquely. See, e.g., Partin, 493 F.2d at 762-64. See generally Louisell & Mueller Sec. 342, at 490-91. We do not appear to have specifically addressed that extension, cf. United States v. Slade, 627 F.2d 293, 304 (D.C.Cir.1980), and we do not do so here. For even if we assume that evidence of some kinds of mental illness is generally inadmissible for impeachment purposes, we think that a tendency to hallucinate is so like a direct physical impairment as to fall well within the old-fashioned rule. See, e.g., Society of Independent Gasoline Marketers of America, 624 F.2d at 467-69. Normally, therefore, a court must not keep such evidence from the jury.[3]
 
 
 17
 The government argues that appellants failed to "establish a foundation" for their claim because they decided not to cross-examine Anthony Chandler on his hallucinations. At first blush, that argument seems absurdly unfair to criminal defendants, since it would require them, in cross-examining a prosecution witness, to ask the clincher question first and, upon receiving an unfavorable answer, drop the inquiry in silence. As the trial court itself admitted, that approach is quite "risky"--it could easily leave defense counsel in front of the jury holding a popped balloon, looking at once ridiculous and obnoxious.
 
 
 18
 The government relies for its foundation argument on Luce v. United States, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The defendant in Luce had asked the trial court for an in limine decision barring the government from cross-examining him on his prior convictions if he took the stand. The court denied the motion, and the defendant did not take the stand. Upon his conviction, he challenged the court's evidentiary decision under Federal Rule of Evidence 609(a)(1). The Supreme Court held that Luce's decision not to testify foreclosed him from bringing this claim on appeal.
 
 
 19
 We have found no case considering whether Luce extends to the general problem at issue here: whether during cross-examination a party must ask "risky" question X in order to preserve his right to challenge a court's decision to keep him from asking related question Y. And the rationale of Luce appears inapplicable. First, that case concerned an in limine ruling that came well before the relevant witness was to have taken the stand and delivered his testimony. To the extent that the witness's actual testimony (or other developments in the trial) could have affected the factual context on which the ruling depended, the trial judge might have changed his ruling at the appropriate time. Id. at 41-42, 105 S.Ct. at 463. That, of course, is not the case here: at the time of the trial court's ruling, Anthony had already testified for an extended period, and if there was something about his actual testimony that could have informed the court's evidentiary ruling, it had already done so. Likewise, any judicial change of heart on the subject would have had to occur within seconds of the judge's initial ruling, a prospect far too remote to justify the government's preclusion theory.
 
 
 20
 More fundamentally, the Luce Court noted that "[b]ecause an accused's decision whether to testify seldom turns on the resolution of one factor ... a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." Id. at 42, 105 S.Ct. at 463 (internal quotations omitted). And it expressed concern that if non-testifying defendants could appeal such rulings, they could use in limine motions "solely to 'plant' reversible error in the event of conviction." Id. Absent the Luce rule, a defendant who never intended to testify could pursue such motions as a no-lose strategy. If his motion were rejected, he could appeal; if successful, he could generally choose not to testify anyway. See id. at 41 n. 5, 105 S.Ct. at 463 n. 5. By contrast, if the court had permitted Gaskins's counsel to use the psychiatric report, it is hard to imagine that he would not have done so. A temptation to "plant reversible error" appears farfetched here.
 
 
 21
 The Court also noted that where a demonstrably erroneous evidentiary ruling arguably keeps a defendant from testifying, "the reviewing court would still face the question of harmless error." Id. at 42, 105 S.Ct. at 463; see also id. at 43, 105 S.Ct. at 464 (Brennan, J., concurring). Not knowing what the testimony might have looked like, a court would be hard pressed to assess, first, whether it would have done the defendant any good, and, second, whether the other side's cross-examination would have been effective. While the unconducted cross-examination here is an unknown, it might well have led the jury to reject Anthony Chandler's testimony. To be sure, if appellants had gone ahead and asked Anthony about his psychiatric status in December, he might have immediately admitted to hallucinating during the relevant period. That outcome might have rendered the trial court's error harmless, though only if the jury convicted anyway. This possibility alone, however, does not outweigh the unfairness to these appellants of requiring them to pursue potentially self-destructive trial tactics simply to preserve their constitutional rights.
 
 
 22
 Having found that the trial court committed error and that appellants have the right to appeal it, we must now consider whether the government's failure to assert harmless error requires us to reverse the convictions even of defendants who suffered no prejudice, or (alternatively) whether it should alter the harmless error inquiry. I here state my own approach to the matter; Judge Randolph's view, leading him to concur in the result, and Judge Silberman's, leading him to dissent in part, follow in separate opinions.
 
 
 23
 * * *
 
 
 24
 Where a court analyzes the harmless error issue wholly on its own initiative, it assumes burdens normally shouldered by government and defense counsel. This drain on judicial resources inevitably causes delay for parties in other cases. See United States v. Giovannetti, 928 F.2d 225 (7th Cir.1991). More important, where the case is at all close, defense counsel's lack of opportunity to answer potential harmless error arguments may lead the court to miss an angle that would have shown the error to have been prejudicial. On the other hand, where the trial error plainly did not contribute to a defendant's conviction, automatic reversal inflicts on the public the costs of a needless retrial and on other litigants the resulting delays. Reconciling these competing concerns, the Giovannetti court recognized its discretion to proceed with the harmless error analysis despite the government's failure to raise the issue, and identified the following factors as controlling its exercise of that discretion:
 
 
 25
 ... the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court.
 
 
 26
 Id. at 227. The first two elements[4] seem to me closely connected, for the longer and more complex the record, the more likely the reviewing court is to be uncertain about the effect of the error.
 
 
 27
 I agree with the general approach of Giovannetti. Only if one adopts an absolutist approach to the adversary system can one contend that courts must never address unargued issues, no matter how obvious their proper resolution may be. Certainly the Supreme Court rejects such an approach. In United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), for instance, after holding that certain evidence supporting a search warrant was unconstitutionally gathered, the Court went on without the benefit of briefing to decide that the violation was harmless in light of untainted evidence that independently established probable cause. Id. at 719-21, 104 S.Ct. at 3305-06; see also id. at 736, 104 S.Ct. at 3314 (opinion of Stevens, J., dissenting) (noting that the issue "was not raised in the petition for certiorari and has not been briefed by the parties"); see also Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 1069, 103 L.Ed.2d 334 (1989) (addressing a retroactivity issue that was addressed only in a single amicus brief). Moreover, in conducting a harmless error analysis without briefing, we are not plucking issues from thin air. As in Karo, the parties here argued the main issue (the propriety of the district court's ruling) and simply failed to address its likely impact on the final result.
 
 
 28
 To be sure, a court should normally conduct the harmless error inquiry on its own initiative only where the relevant portions of the record are reasonably short and straightforward. Moreover, where a court does conduct the inquiry on its own, it should err on the side of the criminal defendant. In the normal case, where the government does raise the issue, the relevant standard for confrontation clause violations is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438 (emphasis added). Where the government does not raise the harmless error issue, I would deem errors "harmless" only where satisfaction of that standard is beyond serious debate. See Giovannetti, 928 F.2d at 226-27. Here, as the record is neither long nor complicated, I think the inquiry suitable.
 
 
 29
 Judge Randolph concurs in the analysis of the facts below, although, as I understand his position, he regards as surplusage the references to whether a finding of harmlessness is indisputable.
 
 
 30
 * * *
 
 
 31
 As to three defendants (all but Gaskins), the error was indisputably harmless. It obviously did not harm defendant Antonio, for instance, since Anthony Chandler never once mentioned him during his testimony. One might argue that Anthony's testimony bolstered the testimony of government witnesses Reginald Chandler and Marguerite Briscoe--who did finger Antonio--because all three testimonies were reasonably consistent with one another. Yet inferring from this that the error prejudiced Antonio requires a caution so extreme as almost to preclude finding any error harmless. First, the testimony of the police officers was also consistent with that of Reginald and Briscoe. More fundamentally, the net effect of Anthony's testimony may well have been beneficial to Antonio, as his total omission of Antonio's name would have tended (if anything) to make jurors question whether Antonio really was part of the drug gang.
 
 
 32
 Nor can we imagine a serious argument for reversing the convictions of appellants Pryce and Thomas.[5] As the arresting officers testified, they were (unlike Gaskins and Antonio) arrested with their drugs and associated paraphernalia at 293 N St., S.W., the home of the operation. Moreover, Reginald Chandler and Marguerite Briscoe described the activities of Pryce and Thomas at greater length and in much more vivid detail than they did the much lesser roles of Antonio and Gaskins.
 
 
 33
 The issue becomes harder when we consider whether the trial court's error contributed to appellant Gaskins's conviction. One could argue that because Briscoe and Reginald Chandler both implicated him in their testimony, Anthony Chandler's testimony was merely cumulative--and harmless. Perhaps so. But as the matter is open to serious debate, we reverse Gaskins's conviction.
 
 
 34
 First, Briscoe hardly ever mentioned Gaskins in her testimony. On direct, she made several spot references to his presence in the apartment, see 5/3 Tr. at 5, 8, 12, 15-16, but her most damaging testimony, if it can be called that, is that Gaskins once stood by looking at a crack transaction but "didn't do anything." Id. at 15-16. Only once did she accuse him of clearly criminal activity. On cross-examination, after she denied that her relatives--the Chandler cousins--ever dealt drugs in the apartment, a defense lawyer probed further, hoping for a different answer: "Only Peter, Paul, Jerry, and Terry were dealing drugs?"[6] Id. at 35 (emphasis added). Once again defending the innocence of her son and nephew, she answered, "Yes." That answer, given the context of the inquiry, hardly begins to establish Gaskins's guilt. (The government extravagantly paraphrases this as testimony that Gaskins "was seen handling the crack many times".) Moreover, Briscoe's credibility is seriously open to question: she once denied to a grand jury that she saw drug transactions in her house, see id. at 34, 72, and, during the relevant period, she was on a number of medications (not to mention crack, see, e.g., id. at 17-18) under whose influence she had "a hard time remembering things sometimes", id. at 38.
 
 
 35
 Reginald Chandler's testimony was much more damning. He testified that although Gaskins was not a leading character in the conspiracy, he did perform a variety of ministerial, look-out, and enforcement functions. Yet Reginald's testimony against Gaskins was somewhat vague; rather than narrating specific events and acts, he concentrated almost entirely on describing Gaskins's general role within the conspiracy. See, e.g., 5/3 Tr. at 108-09, 118, 148-49; 5/4 Tr. at 58-60. But cf. 5/3 Tr. at 107. Anthony Chandler, by contrast, emphasized two specific moments in which he personally saw Gaskins perform his alleged enforcement role for the group. 5/4 Tr. at 88-90. The concrete nature of the testimony may have been decisive for the jury.
 
 
 36
 Quite apart from that concern, the jury might have been troubled by the fact that Reginald Chandler, who apparently could have been prosecuted with the others but wasn't, agreed to testify after negotiating an agreement with the prosecution. See 5/3 Tr. at 92-94; 5/4 Tr. at 63. Along similar lines, the jury might have wondered why Reginald never even mentioned Gaskins in earlier testimony before a grand jury. See 5/4 Tr. at 61-62. Because of these or other reasons, it might not have wished to convict Gaskins on the basis of what amounts to one person's arguably self-interested testimony.
 
 
 37
 To be sure, the jury apparently found Antonio guilty on the strength of the testimony of Briscoe and Reginald, who in turn attributed to Gaskins and Antonio similar roles in the conspiracy. One could argue from this that Antonio's conviction embodies a kind of controlled experiment proving that the jury would have convicted Gaskins absent Anthony's testimony. Yet the testimony against Gaskins was distinct from that against Antonio. Antonio, for instance, is said to have been part of the drug operation from the very beginning, see, e.g., 5/3 Tr. at 7, while Gaskins turned up later and, consequently, may have appeared less integral to the scheme. Antonio's conviction is not enough to show conclusively that the jury would have convicted Gaskins in the absence of trial error.
 
 
 38
 In short, Anthony Chandler's testimony might have tipped the scales, and the jury's exposure to his hallucinations might have produced a different outcome. We simply do not know. But as the issue is at least debatable, we will not deem the error harmless. We therefore reverse Gaskins's conviction and remand for a new trial.
 
 
 39
 * * *
 
 
 40
 Appellants also argue that the trial court erred in instructing the jury on what it means, under 18 U.S.C. Sec. 924(c), to use a firearm "in relation to" a drug trafficking crime. The court declared:
 
 
 41
 "In relation to" means that there must be a relation between the firearm and the underlying narcotic offense. You may infer that the possession of the firearm is intended to facilitate the underlying narcotic offense, but you are not required to do so.
 
 
 42
 5/8 Tr. at 75. Appellants raise two discrete objections to this instruction. First, they argue that the court should have required the jury, before convicting appellants on the Sec. 924(c) count, to find that the relevant firearm was an "integral part" of the conspiracy's drug trafficking crimes. Although several courts have used that metaphor in discussing Sec. 924(c)(1), see, e.g., United States v. Munoz-Fabela, 896 F.2d 908, 911 (5th Cir.1990); United States v. Matra, 841 F.2d 837, 843 (8th Cir.1988), neither this circuit nor any other has required its use in the jury charge. Cf. United States v. Morrow, 923 F.2d 427 (6th Cir.) (finding charge substantially in the language of the statute to be plain error), vacated and ordered reheard en banc, 932 F.2d 1146 (6th Cir.1991).
 
 
 43
 Appellants' more serious objection, which they raise in a single cryptic footnote, see Brief for Appellant Thomas at 11 n. 17, suggests that the second sentence of the instruction improperly permitted the jury to infer that any drug distributor who uses (or carries) a gun at all does so in connection with his drug operations. As the closest appellants came to raising the issue at trial, a vague assertion that they "would object vehemently to any inference given with respect to this charge", 5/5 Tr. at 114, was too general to alert the trial court to their current claim, our inquiry is limited to determining whether the instruction amounted to "plain error". See Fed.R.Crim.P. 52(b).
 
 
 44
 If the jury instruction clearly meant what appellants obscurely wish us to think it meant, it might have constituted reversible error. See United States v. Stewart, 779 F.2d 538, 540 (9th Cir.1985). Yet under a more probable interpretation, the instruction simply reminded the jury that, upon due deliberation, it had two choices: it could find the evidence enough to show the necessary link between guns and drugs, or not enough. Read this way, the instruction arguably announced the obvious, but jury instructions often do that. By contrast, appellants' suggested interpretation--that the instruction permitted the jury to choose between two contradictory legal standards--would render it absurd. At any rate, though not a model of clarity, the instruction did not constitute plain error.
 
 
 45
 * * *
 
 
 46
 Appellants' remaining arguments do not merit discussion.
 
 
 47
 We affirm the convictions of appellants Thomas, Pryce, and Antonio, but reverse that of appellant Gaskins.
 
 
 48
 So ordered.
 
 RANDOLPH, Circuit Judge, concurring:
 
 49
 I see no need to decide what we would decide if the case before us were a different case. The Confrontation Clause violation was harmless beyond a reasonable doubt with respect to defendants Pryce, Thomas, and Antonio, but not with respect to defendant Gaskins. We reached that judgment by reviewing the whole record, which I believe we were obligated to do despite the government's failure to make a harmless error argument. Whether we should follow a different course in a more complicated case, as Judge Williams suggests, is a question I would leave for another day.
 
 
 50
 The question does not appear to be particularly pressing. Since 1919 federal courts have been constrained to disregard trial errors not affecting substantial rights, Act of Feb. 26, 1919, ch. 48, 40 Stat. 1181,28 U.S.C. Sec. 391 (currently 28 U.S.C. Sec. 2111), but our research indicates that United States v. Giovannetti, 928 F.2d 225 (7th Cir.1991), is the first reported case to discuss whether the government can "waive" a harmless error by neglecting to raise it. See also United States v. Davenport, 929 F.2d 1169, 1175 (7th Cir.1991). Yet in 72 years, Giovannetti cannot possibly be the first time the government has dropped this ball. It seems far more likely that over the years reviewing courts affirming convictions have considered it their duty to disregard trial errors of no consequence despite the government's failure to say so. The mandatory language of current Fed.R.Crim.P. 52(a) and its statutory counterpart, as well as the Supreme Court's formulation for constitutional errors, see Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), tend to support that viewpoint. See 28 U.S.C. Sec. 2111; United States v. Hasting, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983).
 
 
 51
 At all events, we have decided here to consider the harmless error question in the face of the government's silence about the subject. At least in this case we have done so because, as Judge Williams explains, the record is "short and straightforward" and because, in my view, the government's litigating position did not relieve us of our duty to disregard harmless errors. I would let it go at that. The government already has incentive enough to raise harmless error when it reasonably can do so. The burden of persuasion is on the government; doubts about whether the error was harmless are resolved in favor of the defendant; and reversals more readily result when the government does not even try to persuade a court of appeals that the conviction was unaffected by the error.
 
 
 52
 I cannot agree with Judge Silberman that no matter what the trial error, no matter how technical the defect, no matter how petty and inconsequential the miscue, we must automatically reverse convictions whenever the government fails to utter the word "harmless." True enough, as the court said in Giovannetti, 928 F.2d at 226, many legal rules are written in mandatory terms yet can be waived, either by intentional relinquishment of a known right (Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)), or failure to assert one's right in a timely fashion (Wainwright v. Sykes, 433 U.S. 72, 91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977)). But to find a "waiver" here one must assume the government possesses some "right." The harmless error doctrine is not so framed; it instructs courts when to affirm convictions despite mistakes at trial. We would not say that because a party failed to invoke a controlling precedent the party has waived it and the court must therefore disregard stare decisis in reaching its decision. Neither would we review the evidence supporting a conviction de novo just because the government neglected to mention the standard governing review set forth in Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Nor would we automatically reverse a criminal conviction if the government confessed error on appeal. "[S]uch a confession does not relieve this Court of the performance of the judicial function." Young v. United States, 315 U.S. 257, 258, 62 S.Ct. 510, 511, 86 L.Ed. 832 (1942). See also Rinaldi v. United States, 434 U.S. 22, 23, 98 S.Ct. 81, 82, 54 L.Ed.2d 207 (1977); Gibson v. United States, 329 U.S. 338, 344, 67 S.Ct. 301, 304, 91 L.Ed. 331 (1946); DeMarco v. United States, 415 U.S. 449, 451, 94 S.Ct. 1185, 1186, 39 L.Ed.2d 501 (1974) (Rehnquist, J., dissenting). "The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed." 315 U.S. at 258-59, 62 S.Ct. at 511. In support of this statement, the Supreme Court in Young cited the decision of this court in Parlton v. United States, 75 F.2d 772 (D.C.Cir.1935), which has never been overruled. Parlton held that in criminal cases, the government's confession of error does not relieve the court of its "responsibility to examine the whole record before setting aside a conviction for crime." 75 F.2d at 773. See also Upshaw v. United States, 168 F.2d 167 (D.C.Cir.), rev'd on other grounds,335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948).
 
 
 53
 Later decisions may have rendered the rule of Young discretionary, at least at the certiorari stage. See, e.g., Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960); Casey v. United States, 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1952); id. at 810, 72 S.Ct. at 1000 (Douglas, J., dissenting). In recent years the Supreme Court has sometimes accepted the government's confession, granted certiorari, and vacated and remanded for reconsideration in light of the government's position. See, e.g., Alvarado v. United States, --- U.S. ----, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990); Mariscal v. United States, 449 U.S. 405, 101 S.Ct. 909, 66 L.Ed.2d 616 (1981). The fact remains, though, that even the government's express admission of error is not treated as some sort of Johnson v. Zerbst "waiver," as if the government were intentionally relinquishing its "right" to have convictions affirmed. There is no way to reconcile this settled practice--and the law of this circuit under Parlton--with the notion that when the government does not confess, when it fails to say one way or the other whether it views the error as harmless, the court should deem its silence to be a waiver of the harmless error doctrine and automatically reverse the conviction.
 
 
 54
 I join Judge Silberman in his respect for the adversary process, but his tribute seems strangely out of place. In this case, neither side even briefed the issue that divides us. We of course could have called for supplemental briefing on the question of "waiver." If we find the lack of adversariness troubling when the government has not raised harmless error, we always have the option of doing the same.
 
 SILBERMAN, Circuit Judge, dissenting in part:
 
 55
 I agree that the district court's refusal to allow defense counsel to cross-examine Anthony Chandler concerning his treatment for hallucinations violated the Confrontation Clause rights of Pryce, Antonio, and Gaskins. I also agree that appellants' remaining arguments are without merit. I disagree, however, with my two colleagues' determinations--based on different rationales--that Pryce's and Antonio's appeals can be rejected under the harmless error doctrine notwithstanding the government's inexplicable failure to argue that the error was harmless.
 
 
 56
 I admit that it makes me more than a little uncomfortable to base my position on what seems an obvious mistake on the part of the U.S. Attorney. There are surely some who would argue that this is one more example of a judge embracing a technicality to overturn convictions of "obviously guilty" felons and who would then ask "whose side is the judiciary on anyway?" But that is the very point--the judiciary is on no side. That proposition is not a technicality; it is fundamental. We judges must be strictly neutral with respect to all cases that come before us in the manner in which we treat the parties and particularly as to the consequences of our opinions. That does not mean, of course, we should be blind to the implications of any principle of law as applied in a given case. We certainly may not, however, let a desired result lead us to a decision without fully explaining our reasoning in general enough terms to have articulated the applicable principle of law. This process is not without intellectual pain, but it is the single most important restraint on the exercise of judicial power. See generally Scalia, The Rule of Law as a Law of Rules, 56 U.Chi.L.Rev. 1175 (1989).
 
 
 57
 The government's failure (or refusal for reasons not apparent) to argue harmless error puts the judiciary's neutrality at issue because another related tenet of our system of justice is that we "recognize[ ] an adversary system as the proper method of determining guilt." Singer v. United States, 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965). And "[t]he premise of [that] adversarial system is that appellate courts do not sit as self-directed boards of inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983). We thus ordinarily have no right to consider issues not raised by a party in either briefing or argument, both because our system assumes and depends upon the assistance of counsel, see id., and because of the unfairness of such a practice to the other party, see, e.g., McBride v. Merrell Dow and Pharmaceuticals, Inc., 800 F.2d 1208, 1210 (D.C.Cir.1986).
 
 
 58
 Applying these principles to the present case, I do not believe we may consider whether the grave error appellant's counsel presses upon us was harmless. As the government did not argue that the harmless error exception applies, "respect for the adversary process makes it inappropriate to address [harmless error] at all." In re Barr Laboratories, 930 F.2d 72 (D.C.Cir.1991).
 
 
 59
 Judge Randolph's concurring statement seems to present the broader challenge to the principles I have outlined above. It appears to me that Judge Randolph, unlike Judge Williams, does not wish to endorse United States v. Giovannetti, 928 F.2d 225 (7th Cir.1991), but is nevertheless not prepared to commit to any other rationale for reaching and deciding the harmless error issue apart from saying that the record is relatively short. Insofar as that position differs from Judge Williams', it does not seem to be based on any principle that I can discern. Judge Randolph does not appear to embrace the arguments he puts forth at pp. 1351-52 sufficiently to fashion any general principle of law that would serve to justify that which the majority has done in this case.
 
 
 60
 Nor am I prepared to place any weight at all on Judge Randolph's observation that no federal court prior to the Seventh Circuit this year has discussed the issue. It may well be that the issue had not arisen before 1990; after all, it would not normally unless a U.S. Attorney makes a rather spectacular mistake. Or it may be that it was at some time implicitly presented, but a court did not realize that it passed by the threshold issue in determining that an error was harmless. The same thing sometimes happens with respect to jurisdictional issues--which is why, for instance, the Supreme Court has said that cases implicitly deciding jurisdictional issues have no precedential value with respect to those issues, see, e.g., Will v. Michigan Dept. of State Police, 491 U.S. 58, 63 n. 4, 109 S.Ct. 2304, 2307 n. 4, 105 L.Ed.2d 45 (1989).
 
 
 61
 I am also not persuaded by his tentative suggestion that the "mandatory language," Conc.Op. at 1351, of FED.R.CRIM.P. 52(a), which states that "[a]ny error ... which does not affect substantial rights shall be disregarded," gives the court inherent power to find error harmless and makes the issue non-waivable. As the Seventh Circuit recognized, "[i]t is true ... that the language of Rule 52(a) is mandatory. But this is a general feature of legal rules, and does not make their provisions non-waivable. Specific rules of conduct or procedure are promulgated against a background of understandings concerning the procedure for invoking the benefits of rules, or for waiving those benefits."[1] Giovannetti, 928 F.2d at 226. For this reason, "[i]t cannot lightly be assumed that ... [a rule is] intended to distort [the adversary] process." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 419, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978). Rules creating an exception to the adversary process thus are generally quite explicit on the matter, see, e.g., FED.R.CIV.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.") (emphasis added); see also FED.R.CIV.P. 11, 21, 26(g), whereas rules or statutes which we have never thought of as imposing obligations on us to proceed without regard to the parties' submissions are phrased in the same way as Rule 52(a), see, e.g., FED.R.CRIM.P. 6 ("The court shall order one or more grand juries to be summoned at such time as the public interest requires."); 5 U.S.C. Sec. 706 ("The reviewing court shall (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....").
 
 
 62
 The Supreme Court has, moreover, repeatedly stated that the government bears the burden of demonstrating on appeal that an error was harmless. See, e.g., Arizona v. Fulminante, --- U.S. ----, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991); Chapman v. California, 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967). Surely this settled allocation of roles necessarily implies that the issue can be waived. How can the government discharge its burden when it fails to mention the issue at all? Even if Parlton v. United States, 75 F.2d 772 (D.C.Cir.1935), holding that this court will independently examine the record in a criminal case notwithstanding a government confession of error, were thought to control the issue with which we are presented (see my discussion of the Supreme Court's treatment of a government confession of error, infra ), I do not see how that reading could survive Chapman, which makes clear that typical adversarial norms govern appellate consideration of harmless error. When there is tension between one of our opinions and subsequent Supreme Court cases, I would have thought that it would be readily accepted that the Supreme Court's view would prevail.
 
 
 63
 And it simply cannot be, as Judge Randolph suggests, that the government may not waive harmless error because it possesses no "rights" regarding harmless error. Unlike defendants, the government in criminal cases almost never possesses a "right" with respect to any issue, yet it may still waive them. See, e.g., United States v. Malin, 908 F.2d 163, 167 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990) (government did not argue on appeal and therefore waived the argument that the defendant failed to preserve an objection to jury instructions). And, after all, the government might honestly believe that if the trial judge's conduct was erroneous, the error had an impact on the trial. If that were so (and we cannot really be certain that is not true here), we would not expect the government to argue harmless error. If the government refuses to argue the point (as it did here), I do not see how the court can sua sponte raise the issue without encroaching into the executive branch's prosecutorial prerogatives. Nor do I consider the Supreme Court's treatment of confessions of error to be apposite. The Supreme Court reviews appellate opinions, ones which it more often than not views as incorrect. If a party could eliminate the Courts' power to act on a case simply by confessing error and thereby allow the appellate precedent (though not the judgment) to stand, the party would be able to employ the adversary process illegitimately to insulate favorable precedents from reversal. Compare Air Transport Ass'n v. Dep't of Transportation, 933 F.2d 1043, 1043-44 (D.C.Cir. June 4, 1991) (Silberman, J., concurring). Accordingly, the Supreme Court must be able, as Judge Randolph agrees is the current practice, to vacate the opinion below and remand for reconsideration. On the other hand, when "[t]o accept ... [a] confession of error would not involve the establishment of any precedent," the Court has not hesitated to follow the adversary system. Casey v. United States, 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1952).[2] Of course, we would not allow a precedent to stand if we held the government to its "waiver" in this case.
 
 
 64
 Judge Williams, by contrast, is rather firm as to his reasons for considering whether the harmless error exception applies notwithstanding the government's failure (waiver) to raise the point. He would have the court follow the approach the Seventh Circuit adopted earlier this year on rehearing in Giovannetti, 928 F.2d at 226-27, in which the court held that it had discretion to overlook the government's waiver if it could be readily determined by the court that the error was harmless.[3] Otherwise, the costs to innocent third parties, whose access to the district court is at least in some measure impaired because of a new trial for the appellant--a new trial that is extremely unlikely to change the result--outweighs the need to "sanction" the government. See Giovannetti, 928 F.2d at 227. Judge Williams would prefer to describe the costs of a new trial as borne by "the public" rather than by innocent third parties, but I gather he otherwise accepts Giovannetti 's logic.
 
 
 65
 Although I have long believed that lawyers and judges tend to disregard the costs the legal process imposes on society, see generally Silberman, Will Lawyering Strangle Democratic Capitalism?, REGULATION 15 (Mar/Apr 1978), I do not think Judge Williams' (and the Seventh Circuit's) "solution" to this problem is appropriate or wise. I hold that view because to adopt the Giovannetti rule is to put an aberrant twist on the adversary model. To be sure, the model is probably not the most cost-effective method of finding truth or ascribing guilt or innocence, but it hardly needs repeating that it is a fundamental aspect of our legal tradition which judges have no warrant to disregard. However sensitive to the costs and benefits of the legal process we should be in understanding the legal rules we apply, it is hard for me to see how efficiency concerns can be the source of our power.
 
 
 66
 Certainly United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), upon which Judge Williams relies, does not confer authority on the courts of appeals to decide questions in favor of the government in criminal cases where the government does not even argue them. The issue which the Supreme Court reached in that case--whether a warrant was nevertheless justified by untainted evidence (after holding that other evidence was tainted)--was expressly raised by the government in the court of appeals. See, United States v. Karo, 710 F.2d 1433, 1440-41 (10th Cir.1983). To be sure, Justice Stevens objected that the question exceeded the scope of the writ of certiorari, see Karo, 468 U.S. at 736, 104 S.Ct. at 3314 (Stevens, J., dissenting), but that is a question that goes to the Court's management of issues presented to it and decidedly does not even implicate an issue of the government's waiver. Nor can it be said, in any case, that the question whether or not an error is harmless is somehow not a significant or "main" issue. It is one of the more difficult analytic questions that appellate judges encounter--the resolution of which is not without significance to defendants.
 
 
 67
 It is difficult, moreover, to see a principled stopping place to Judge Williams' balancing test. Should we be willing to overlook counsel's failure to raise a clearly winning argument--even in civil cases--if by doing so we can save the expense of a new trial (or other societal costs)? Or is this a rule for criminal cases only? And if it is the latter, is that because the courts have some unstated responsibility to help the government in its prosecution of defendants? I think not--we have only the duty to apply the law neutrally in both criminal and civil cases.
 
 
 68
 When judges think of themselves as bearing responsibility for the results dictated by a neutral application of the law, whether in the civil or criminal field, they tend to exceed appropriate bounds of judicial restraint. By compromising its neutrality, I think the court does so here. That "cost" far exceeds the costs of a new trial for Pryce and Antonio.[4]
 
 
 
 [1]
 Specifically, they were convicted of conspiring to distribute cocaine base and of conspiring to possess cocaine base with intent to distribute, in violation of 21 U.S.C. Sec. 846; of possessing with intent to distribute 50 grams or more of cocaine base on December 20, 1988, in violation of 21 U.S.C. Secs. 841(a)(1) and (b)(1)(A)(iii), and aiding and abetting the same, see 18 U.S.C. Sec. 2; and of using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. Sec. 924(c), and aiding and abetting the same, see 18 U.S.C. Sec. 2
 
 
 [2]
 At oral argument, the government lawyer effectively conceded as much, stating: "We're not prepared in light of Davis v. Alaska, your honor, to say that the restrictions that were imposed would ultimately be upheld on appeal, because in all candor, I believe that Davis v. Alaska would not support these limitations." Tr. of oral arg., 2/21/91
 
 
 [3]
 No one has claimed that counsel's use of the report--the exact nature of which is unknown as a result of the trial court's ruling--would have violated any privilege of Anthony Chandler. Cf. D.C.Code Sec. 14-307 (1981); Collins v. United States, 491 A.2d 480, 485 (D.C.App.1985). At any rate, the trial court restricted not only use of the report itself but also any reference to pre-December hallucinations
 
 
 [4]
 The role of the third factor is unclear, especially as one would expect that the prospect of "protracted, costly, and ultimately futile proceedings" would normally lead to some sort of consensual disposition, although the effect of the government's paying the costs of both counsel (where that is the case) would reduce the likelihood
 
 
 [5]
 As an incidental matter, we note that appellant Thomas has never challenged the trial court's evidentiary ruling
 
 
 [6]
 These are the aliases of the four appellants. Gaskins is "Terry"
 
 
 [1]
 The concurrence relies on United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), but Hasting held only that courts may not ignore the harmless error doctrine simply because they are proceeding under their supervisory powers. See 461 U.S. at 505, 103 S.Ct. at 1979. There is no indication that the government did not argue that the error was harmless
 
 
 [2]
 The distinction between not citing a case and not raising an argument is so well-known as to be beyond dispute. The former never bars a court from relying on the precedent; the latter virtually always precludes the court from relying on the argument
 
 
 [3]
 The Giovannetti court originally held that the government waives harmless error when it fails to raise the issue. See United States v. Giovannetti, 919 F.2d 1223, 1229 (7th Cir.1990)
 
 
 [4]
 In this case there will have to be a new trial for Gaskins anyway (with which the proceeding for Pryce and Antonio could again be consolidated), so the cost of holding the government to its waiver of the issue will not be high. And I rather doubt the government would make this mistake (if it is a mistake) again